**SAUNDERS PETROLEUM CO. v. BOWLES, Price Adm'r.**

No. 170.

United States Emergency Court of Appeals. Heard at Omaha Sept. 14, 1945.

Dec. 3, 1945.

---

114

Herbert Jacob, of Kansas City, Mo. (Lee Reeder, of Kansas City, Mo., on the brief), for complainant.

Samuel M. Singer, Atty., OPA of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, Jacob D. Hyman, Asst. Gen. Counsel, and Lester N. Salwin, Atty., all of the OPA, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

McALLISTER, Judge.

This case involves an order issued by the Office of Price Administration, pursuant to Maximum Price Regulation No. 88—Fuel Oil, Gasoline, and Liquified Petroleum Gas.

The background of the controversy is as follows:

The Pokorney Oil Company—not a party to these proceedings—had a contract in 1943 to furnish residual fuel oil to the Nebraska Defense Corporation, an ordnance plant located at Mead, Neb.

In order to carry out its agreement, the Pokorney Company entered into a contract with the Saunders Petroleum Company, complainant herein, by the terms of which, the Saunders Company agreed to deliver 7,000,000 gallons of fuel oil to the ordnance plant. The oil contracted for was described as No. 5 fuel oil, 16°–20° A. P. I. gravity. The parties agreed upon a delivered price of 4.4 cents per gallon. The Pokorney Company, however, was to receive in payment from the ordnance plant 4.7 cents per gallon.

The contract between the Pokorney Company and the Saunders Company was entered into on May 26, 1943. A little more than a year after the execution of the contract whereby the Saunders Company agreed to supply the Pokorney Company's client with oil at the ordnance plant at 4.4 cents per gallon, and after approximately 3,000,000 gallons of the gas had been delivered by the Saunders Company, the Price Administrator entered an order establishing a maximum price for the oil delivered to the ordnance plant.

In this order, dated May 29, 1944, the Administrator established the price for the oil retroactively to July 15, 1943, at 4.11 cents per gallon. At the time this order was entered, the Saunders Company had been delivering the oil to the ordnance plant under its contract with the Pokorney Company for nearly a year at 4.4 cents per gallon.

When the retroactive order at 4.11 cents per gallon was made, the attorney for the Saunders Company at Kansas City, Mo., called the Fuel Oil Unit, Petroleum Branch of the Office of Price Administration at Washington, by telephone, and pursuant to the conversation filed a protest to the order establishing retroactively the maximum price for the fuel oil which the Saunders Company had delivered.

The Administrator based his order on a consideration of the following sections of Maximum Price Regulation No. 88:

In Section 5.1 of Maximum Price Regulation No. 88, it is provided: "A seller's maximum price for a petroleum product of a particular grade shall be the lowest quoted price published in the October 8, 1941, issue of the National Petroleum News for a product of the same grade."

Section 5.2 provides that if prices "cannot be determined under Section 5.1, the maximum price for each seller * * * shall not exceed the price charged at that point (the given shipping or delivery point) by him on the last sale of the same product to a purchaser of the same class within 60 days prior to October 15, 1941."

Section 5.3 provides for the determination of a seller's maximum price "In accordance with the maximum price of another seller at the same point * * *."

None of the foregoing sections were considered applicable by the Administrator, for the reason that, as he explained to complainant, "since no sales of residual fuel oil delivered at Mead, Nebraska, were made during the 60 day period prior to October 15, 1941,—as provided in Section 5.2(c) of Maximum Price Regulation 88, your maximum prices would necessarily have to be determined in accordance with Section 8.3."

Section 8.3, in so far as here applicable, provides:

"(a) If under any preceding section of this regulation a seller is unable to determine the maximum price at a given shipping or delivery point for any product covered by this regulation then the seller may nevertheless make the sale of such product at the said point or may notify the Office of Price Administration in writing that he has set a tentative maximum price for the product at the shipping or delivery point.

In giving notice of the setting of such tentative maximum price or within 15 days of the making of the said sale, the seller shall file with the Petroleum Branch of the OPA a written request for the approval of either the tentative or sale price  *  *  *.

"(b) If a seller shall fail to report a sale as required by paragraph (a) above, the OPA may at any time upon written notice to the seller establish his maximum price for the particular product at the particular point effective retroactively to a date 15 days after the making of the said sale."

The Administrator's justification for the retroactive order was that complainant did not report its tentative sales price for the oil delivered to the ordnance plant as required by Section 8.3(b) of the Regulation; and that, in default of such report, the Administrator, in accordance with that section, on discovery of complainant's noncompliance with the Regulation, properly issued the order of March 29, 1944, fixing complainant's maximum price retroactively to July 15, 1943, at a price of 4.11 cents per gallon—or .29 cents per gallon less than the price at which it had been furnishing oil to the ordnance plant for the preceding year.

In the protest, it was objected that the order establishing the maximum price of the oil was improperly issued because: (1) Complainant's maximum price was determinable under Section 5.2(c) of the Regulation instead of under Section 8.3, as contended by the Administrator; (2) That the maximum price established by the order failed to take into account complainant's customary method of fixing prices on the basis of "f.o.b. Group 3 (Oklahoma) plus freight to destination"; (3) That the price established by the order was inadequate because it did not take into consideration the possible necessity of complainant being obliged to obtain the oil (which it agreed to furnish under its contract with the Pokorney Company) from distant refineries, for delivery to the ordnance plant at Mead, Neb.; and (4) That the Office of Price Administration had, on October 12, 1943, approved, by letter, a maximum price for sales of oil to the ordnance plant at a figure higher than that charged by complainant to the Pokorney Company.

By an order issued on September 8, 1944, accompanied by an opinion, the Administrator denied complainant's protest, and thereafter, complaint was filed, directed against the order of denial.

At the time of the proceedings before the Administrator, it was considered by complainant—as appears from the protest—that its maximum price for the oil in question was determinable under Section 5.2(c) of Regulation 88, instead of under Section 8.3, as contended by the Administrator. Since that time, however, counsel for complainant have arrived at the conclusion that this stand was not well taken and it is now conceded that the only section of the Regulation under which the maximum price is determinable in this case is Section 8.3.

The questions presented in these proceedings are: (1) whether the order complained of was arbitrary or capricious; and (2) whether the order was properly issued under Section 8.3 of Regulation 88.

The pertinent sections of the Regulation have already been mentioned, but some additional consideration of them will serve to clarify the issues.

Under Section 5.1 of the Regulation, in so far as pertinent to this case, the maximum delivered price was based upon the lowest quoted delivered price for a particular grade of petroleum product in the October 8, 1941, issue of the National Petroleum News. This section was not applicable, because the National Petroleum News quoted no prices for deliveries of residual oil to Mead, Neb., on the date specified.

Section 5.2 provided that when the maximum price could not be determined under Section 5.1, such price should be the price charged by the seller at the given point, on the last sale of the same product to a purchaser of the same class within sixty days prior to October 15, 1941. This section was not applicable, because complainant had not sold residual oil for delivery to Mead, Neb., during the specified base period.

Section 5.3 provided that a seller who had no maximum price at a particular point might adopt the maximum price of another seller who had determined his maximum price in accordance with Section 5.2. This section was not applicable because no seller had quoted maximum prices for delivery of residual fuel oil to Mead, Neb., during the specified base period.

Under Section 8.3—which is here applicable—it is provided that, where the seller is unable to determine the maximum price at a given delivery point, he may make the sale of the product, or may notify the Office of Price Administration that he has set

a tentative maximum price therefor; that, in giving such notice, or within fifteen days of the making of the sale, he shall file with the Office a written request for the approval of either the tentative, or sale price; and that, with such request, he shall file a statement setting forth, among other matters, that (whenever applicable) the price charged by him is in line with the level of maximum prices for the three most closely competitive sellers of his same class, and his own maximum price for the same product at three other points nearest the point at which the tentative price is set. The foregoing, of course, does not constitute the whole of Section 8.3, but such portion, as is above mentioned, taken together with the other sections of the Regulation to which reference has been made, evinces a well-defined purpose and requirement: that the maximum price be based upon the level of prices that prevailed, or would have prevailed at the point of delivery—in this case, Mead, Neb.—during the base period specified in the Regulation. The basic scheme of the Regulation is in accord with the statutory requirement that the maximum prices established reflect, so far as practicable, the prices generally prevailing between October 1 and October 15, 1941. Section 2(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix § 902(a). Both the specific maximum prices and the pricing methods set forth in the Regulation are directed to the accomplishment of this purpose.

When the Administrator discovered that complainant company had failed to report the sales of residual fuel oil, as required by Section 8.3(a), he proceeded, under Section 8.3(b) to establish complainant's maximum price for the product delivered to Mead, Neb. Acting in accordance with the above mentioned scheme of the Regulation that the maximum prices established be in line with the actual level of prices that prevailed, or would have prevailed, at the delivery point during the base period, the Administrator was confronted with the fact that there were no deliveries by any sellers of petroleum products to Mead, Neb., during the base period. Failing to ascertain the level of prices that prevailed for the product in question at the point of delivery during the base period—for there were no such prices actually prevailing, inasmuch as there were no sales made during such period—the Administra-

tor undertook to ascertain what level of prices would have prevailed if there had been sales of the residual fuel oil at the point of delivery during the critical period.

In arriving at his conclusion as to what the prevailing level of prices would have been during the base period, the Administrator considered the following evidence:

(1) On May 16, 1944, the Nebraska Producing and Refining Company applied to the Office of Price Administration for a maximum price of 4.11 cents per gallon for the residual fuel oil in question delivered to Mead. This was the identical price established by the order which was protested by complainant.

(2) Complainant's own delivered price of the residual fuel oil in question during the base period, to the Continental Baking Company at Omaha, Neb., was 4.046 cents per gallon, or 0.064 cents less than the price established by the order which was protested by complainant. Omaha is only thirty miles from Mead and is the nearest of all the points at which complainant sold residual fuel oil during the base period. This fact has an important bearing on the maximum price established for sales by complainant, since, under Section 8.3, a seller, in the position of complainant and under the circumstances of this case, who seeks approval of a tentative maximum price, would be required to show that the price set by him is in line with the level of maximum prices for the three most closely competitive sellers of his same class and his own maximum price for the same product at three other points nearest the point at which the tentative price is set.

(3) The maximum prices of three refineries, within 85 to 90 miles of Mead, and in its normal marketing area, were considered by the Administrator. The f.o.b maximum price of the Nebraska Producing and Refining Company, located at Salem, Neb., for the residual oil, similar to that in question, was 3.15 cents per gallon during the base period. By adding the October 1, 1941 (base period) freight cost from Salem to Mead, to the f.o.b. price, there was computed a delivery price to Mead, of 4.001 cents per gallon.

(4) The f.o.b. maximum price of the Mid States Refining Company, located at Falls City, Neb., for the residual oil was 3.186 cents per gallon in the base period. By adding the October 1, 1941, freight cost

from Falls City to Mead, a delivered price to Mead was computed at 4.037 cents per gallon. Both of these computed prices—for the Nebraska Producing and Refining Company, and the Mid States Refining Company—were less than the price of 4.11 cents per gallon established by the order fixing complainant's maximum price, which was the subject of the protest proceedings.

(5) The f.o.b. maximum price of the Searle Petroleum Co., located at Omaha, Neb., for the residual fuel oil during the base period was 4.20 cents per gallon. By adding the October 1, 1941, freight cost from Omaha to Mead, a delivered price to Mead was computed at 4.607 cents per gallon. This was a higher price than that established for complainant; but, taking into consideration the prices at all three refineries above mentioned, a maximum price might be validly established, as one in line with the prevailing level of prices, at a figure lower than that of the Searle Co. Such price is not required to equal the highest base period price. Capital Foundry Co. v. Bowles, Em.App.1944, 146 F.2d 855.

In considering the f.o.b. prices of the refineries for the residual fuel oil during the base period, the Administrator could well arrive at the reasonable conclusion that such prices plus the cost of transportation to Mead would fairly indicate what the base period delivered prices to Mead would have been. Moreover, it appears that subsequent to the issuance of the order protested by the complainant, the Searle Co. actually sold the oil in question to the same ordnance plant at Mead at 4 cents per gallon.

In sum, the application to the Office of Price Administration by the Nebraska Producing and Refining Company in May, 1944, for a delivered price to Mead of 4.11 cents per gallon[1]; complainant's delivered price of the oil during the base period to the baking company at Omaha, at 4.046 cents per gallon; the computation of delivered prices to Mead, from the f.o.b. prices and freight, of the three refineries mentioned; and the sales of the oil by the Searle Co. to the ordnance plant, subsequent to the order here protested, at 4 cents per gallon—all these circumstances constitute evidence which, in our opinion, reasonably sustains the conclusion of the Administrator that a maximum price of 4.11 cents per gallon for complainant's deliveries to Mead, was a price in line with what the general level of prevailing prices would have been, if deliveries of the residual oil in question had been actually made to Mead during the base period.

The Saunders Company, however, complains that it was unreasonable on the part of the Administrator not to take into consideration the fact that it was obligated, under its contract with the Pokorney Company, to deliver 7,000,000 gallons of oil which would, in all probability, require it to secure such oil from distant fields; that although it delivered only approximately 3,000,000 gallons in furtherance of its contract, it was entitled to be compensated for risks assumed in possibly incurring higher freight rates on shipments from such fields. Complainant actually was obliged to import 223,795 gallons of oil from the Wyoming fields in fulfilling its contract, resulting in considerable out-of-pocket losses.

To this argument, the answer is that the basic requirement in establishing maximum prices under the sections of the Regulation applicable to residual oil is that such prices be in line with the level of prevailing prices during the base period, or in line with the level of prices that would have then prevailed. If a maximum price be properly established and if it be "in line", the fact that an individual seller may not be able to realize a profit in a particular operation does not impair the fair and equitable character of the price so established. Moreover, under an order of the Office of Price Administration, in effect on and prior to the date of complainant's contract with the Pokorney Company, there was provided a remedial method whereby a seller could have applied for adjustment of its maximum prices, after they had once been properly established (Section 1305.12 of Revised Supplementary Order No. 9). On such application, or on its own motion, the Office of Price Administration, in accordance with uniform standards adopted and applied in such cases under procedural regulations, could then have adjusted the maximum price or prices of any seller who had entered into a Government contract or

---

[1] The fact that this company never sold and delivered any oil to the ordnance plant at the price applied for does not, as suggested by complainant, prohibit consideration of the application for the price, as evidence tending to show that such price was reasonable.

subcontract for the sale of a commodity essential to the war program, whenever it appeared that such a maximum price impeded or threatened to impede the production, manufacture, or distribution of the commodity subject to such contract or subcontract; and in determining the action to be taken, the applicant's over-all profits were an important consideration. But, even though a party previously might have established its maximum price properly, it could not, because of changing costs or variable factors, adjust such maximum price automatically, itself. Under the above mentioned circumstances, it cannot be concluded that the maximum price established by the Administrator was unreasonable because it did not take into consideration complainant's risks of incurring additional costs in fulfilling its contract with the Pokorney Company.

We come, then, to the contention that the maximum price established for complainant was unreasonable because it was less than the "f.o.b. Group 3 (Oklahoma)" price plus freight to Mead. This "Group 3" price is the price at which, it is claimed, the petroleum industry has, for many years, sold and delivered petroleum products in the middle western area, in which Nebraska is situated. The price in question is arrived at by taking an f.o.b. price at Tulsa, Okl., as published or quoted in the Chicago Journal of Commerce or in the National Petroleum News, and adding thereto freight from Tulsa to the point of destination. In practice, under the Group 3 method, the shipper prices oil f.o.b. Group 3 by adding or subtracting from the cost, so that the total charge is always equal to the price shipped from Tulsa. If the freight from a given point be more than it would have been from Tulsa, the price is reduced accordingly; if less, an amount is added to the price to bring the total to an amount equal to the delivered price from Tulsa.

Complainant's objection to the use of the method adopted by the Administrator in establishing its maximum price is based upon Section 2(h) of the Emergency Price Control Act of 1942, which prohibits the use of the powers granted in the statute, to compel changes in business practices, cost practices or methods, or means or aids to distribution, established in any industry.

To the foregoing, the Administrator replies that under Section 8.3 of the Regulation, maximum prices are established in line with the level of prices that prevailed or would have prevailed during the base period, and that whether the resulting price, in this case, would coincide with "Group 3 plus freight to destination price" is immaterial. Moreover, say counsel for the Administrator, if the prices prevailing at or near Mead, Neb., during the base period had been Group 3 prices, the price which was calculated by the Administrator under Section 8.3 as "in line" with the prevailing prices, would necessarily reflect the prices prevailing under the Group 3 method. However, the record discloses that none of the base period f.o.b. prices which were —in the vicinity of Mead—charged by the three refineries (whose prices were heretofore mentioned as having been used to compute delivered prices that would have prevailed at Mead) were based on any Group 3 pricing methods.

The foregoing leads to the conclusion that the Group 3 method was not such a generally established practice of pricing as would render the method used by the Administrator invalid for compelling changes in cost practices established in the industry. Furthermore, it can be said, in answer to complainant's argument, that it was not shown that Group 3 pricing was consistently applied in pricing residual fuel oil in Nebraska during the base period. On the contrary, it appears that the published Group 3 listing served often merely as a point of departure for the computation of prices; that they were used as methods of quoting prices; and that they were not regularly or uniformly applied in the sales of oil at different times and at numerous places—and certainly not at Mead during the base period. Under such evidence, the Administrator was not bound to recognize Group 3 prices, in establishing the Maximum Price Regulation or in fixing complainant's maximum price in this case.

At this point may be considered complainant's justification for its price of 4.4 cents per gallon, as set forth in its contract with the Pokorney Company. Complainant submits that it relied upon a letter from the Office of Price Administration to the ordnance plant approving a maximum price of 4.7 cents per gallon on sales of the oil in question to the plant. What happened was that the ordnance plant wrote the Office of Price Administration on August 7, 1943, stating that it had entered into a contract with Pokorney for 7,000,000 gallons of the gas in question at 4.7 cents a gallon, and that Pokorney had stated that such price

was within the legal price ceiling. The ordnance plant then inquired whether the contract price was "in line with existing regulations". In reply, the Price Executive of the Petroleum Branch of the Office of Price Administration, after noting that the Pokorney Company had increased the price on the oil "from .04 cents per gallon to .047 cents per gallon as of July 1, 1943", explained that all residual fuel oils in question had been placed on a gravity basis as of March 3, 1943, "in accordance with Amendment 79 to Revised Price Schedule No. 88, copy of which is attached hereto". Further, he advised that inasmuch as the supplier would use a certain computing table, it would be entitled to an increase of 29 cents per barrel above the base price, and that since the oil which the Pokorney Company was supplying was apparently being sold on a gravity basis, the price was "not in violation of the schedule."

In disposing of this question, it is unnecessary to delve further into the technicalities of the price schedules and changes, except, perhaps, to mention that, as contended by the Administrator, when it was stated in the letter that the supplier was entitled to add 29 cents a barrel to its "base prices", it meant an addition to the base price, as defined in Amendment No. 79, and that "base price" as therein defined, referred to a seller's former maximum price for No. 6 fuel oil, under certain provisions of a price schedule. The Administrator contends that the letter in question assumed that the supplier had actually determined its maximum price on the above basis, whereas it appeared from the evidence that such price had not been so determined.

■ But, here, in any event, the interpretation sought was neither requested by, nor addressed to, the complainant. It was, therefore, not entitled to rely on the letter as an interpretation, inasmuch as under Section 51 of Revised Procedural Regulation No. 1, it is provided that an official interpretation shall be applicable only with respect to the particular person to whom, and to the particular factual situation with respect to which, it is rendered, unless publicly announced as an interpretation of general applicability.

Moreover, the determining factor with regard to complainant's contention that it relied upon the letter in question, is the circumstance that complainant entered into the contract with the Pokorney Company on May 26, 1943, and the letter was not written to the ordnance plant until August 12, 1943. Hence, the letter obviously could not have been relied upon by complainant.

It might be that, confronted by such complexities of administrative regulations and procedure, complainant continued the delivery of oil in good faith with mistaken assurance. If so, that would conceivably bear upon the issue whether complainant's violation of the regulation, order, or price schedule, was willful, or the result of failure to take practicable precautions against the occurrence of the violation—a matter which, in enforcement proceedings, determines whether a party is liable for treble damages. Section 205(e), 50 U.S.C.A. Appendix, § 925(e). But with such proposition we are not here concerned. The argument that complainant relied upon the above mentioned letter in contracting for the price with the Pokorney Company is without merit.

Finally, complainant contends that Section 8.3(b) is neither authorized by the Emergency Price Control Act nor constitutionally valid. The constitutional objection is based upon the fact that the particular provision of Section 8.3(b), authorizing the establishment of maximum prices retroactive to a date 15 days after the making of the sale, came into force and effect only with the issuance of Maximum Price Regulation 88 on February 14, 1944. The Regulation was originally issued February 2, 1942, as Revised Price Schedule No. 88. It is contended that because of the penal nature of the enforcement provisions of the Price Control Statute, such retroactive application of the order issued in this case, which did not come into effect until most of the deliveries under the contract had been made, constitutes an ex post facto law, void under Article I, Section 9 of the Constitution of the United States.

■ Neither the attack on the Regulations, as being unauthorized under the Statute, nor the objection to the retroactive feature of the Regulation on constitutional grounds, was raised in the protest filed before the Administrator. In the Price Control Act, It is provided that no objection to a regulation, order, or price schedule shall be considered by the court unless such objection shall have been set forth by the complainant in the protest. Section 204, 50 U.S.C.A.Appendix, § 924. The purpose of requiring the filing of specific objections to the regulations, orders, and schedules, in the protest, is to give the Administrator a

chance to reconsider such matters and to make a record upon which the Emergency Court of Appeals may review the validity of the challenged regulations. Bowman v. Bowles, Em.App.1944, 140 F.2d 974. In this proceeding, complainant is not in a position to raise the statutory and constitutional objections before this court. Bowman v. Bowles, supra. See also Todd v. Securities Exchange Commission, 6 Cir., 137 F.2d 475; American Power & Light Co. v. Securities Exchange Commission, 1 Cir., 141 F.2d 606.

We have considered the other matters submitted in the briefs and on the argument, and find there determination unnecessary to our decision.

In accordance with the foregoing, a judgment will be entered dismissing the complaint.