## AMBROSIA BREWING CO. v. BOWLES, Price Administrator.

### No. 157.

United States Emergency Court of Appeals.
Heard at Chicago Nov. 30, 1944.

Decided Dec. 22, 1944.

Henry W. Dieringer, of Chicago, Ill. (William T. Murphy, of Chicago, Ill., on the brief), for complainant.

John O. Honnold, Jr., Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Henry S. Sellin, Atty., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and LINDLEY and LAWS, Judges.

LAWS, Judge.

This case arises as the result of the Price Administrator's denial of an application made by complainant, a brewer of malt beverages, for approval of a maximum price claimed to be permitted for a brand of beer under existing price regulations.

In June 1943, complainant was producing and selling two brands of beer, one known as "Ambrosia," the other known as "Nectar". The maximum price per barrel for "Ambrosia" was $16.10; for "Nectar," $19.10. Complainant desired to discontinue production of "Ambrosia" and to produce instead a brand to be known as "Ambrosia Supreme". The applicable regulation was Maximum Price Regulation No. 259—Domestic Malt Beverages,[1] which established maximum prices on the basis of those charged by the seller during either October 1-15, 1941, or March 1942. It was provided that the maximum price for any product which could not be priced on the basis of its October 1-15, 1941 or March 1942 price should be the maximum price of the most closely competitive seller of the same domestic malt beverage, or if the same bever-

---

1 7 F.R. 8950.

age was not sold or offered for sale, of a similar beverage. Section 1420.59 of the Regulation contained the following provision: "The selection of a similar malt beverage * * * shall include consideration of 'similar quality' which is the quality obtained by reason of a similar brewing process and equivalent types, grades and proportions of ingredients, without substantial variation."

Complainant, relying on the maximum prices established by its competitors for what it claimed to be similar beers, established for "Ambrosia Supreme" a maximum price of $17.60 per barrel. On July 31, 1943, the production of "Ambrosia" was discontinued and on either August 1 or 3, 1943 (the record is not clear as to which), "Ambrosia Supreme" was introduced and delivered to complainant's customers.

Under Maximum Price Regulation No. 259 there developed an inflationary practice of introducing new brands of beer on the market and pricing them in relation to high priced beers of competitors. To combat this tendency the Administrator, on August 3, 1943, issued Amendment No. 2 to Maximum Price Regulation No. 259, effective August 9, 1943.[2] By this Amendment the method of establishing maximum prices for products not sold in March 1942 or during the period October 1-15, 1941, was changed so as to restrict the pricing of such products on the basis of competitors' prices, it being provided that the maximum price for such a product should be the "maximum price established *by the manufacturer* under the provisions of this regulation for the similar domestic malt beverage most nearly like it * * *." (Italics supplied.) In case a manufacturer was unable to price a product by reference to the maximum price of his own most similar beverage, he was required to apply to the Office of Price Administration for authorization to determine his maximum price in accordance with the maximum price established by his most closely competitive seller for the most similar domestic malt beverage. Manufacturers who, between March 31, 1942 and Au-

gust 9, 1943, had established a maximum price for a domestic malt beverage on the basis of the maximum price of a competitor's similar item, were required to apply for authorization to use such maximum price.

On August 14, 1943, complainant filed its application for approval of the maximum price of $17.60 per barrel which it had established for "Ambrosia Supreme". In its application it stated that its only other product was "Nectar," which could not be referred to in establishing a maximum price since it was in a higher-priced bracket. Various brands of competing manufacturers were named as similar to "Ambrosia Supreme". After information concerning "Ambrosia" had been submitted at the Administrator's request, the application was denied by letter on October 11, 1943, and by formal order, entitled Order No. 7, on December 10, 1943. The position of the Administrator was that the maximum price for "Ambrosia Supreme" should be $16.10 per barrel, the same price which had been charged for "Ambrosia". A formal protest then was filed against Order No. 7, and upon its denial, complaint was filed in this Court.

■ The question presented for our consideration is whether the order of denial was issued in compliance with the Regulation. Complainant maintains that the Administrator was arbitrary and capricious in making the determination that "Ambrosia Supreme" was more similar to "Ambrosia" than to "Nectar". It urges that comparison of alcohol by volume is the only legal method of determining the similarity of beers, and that the Administrator ignored the fact that by this standard "Nectar" is the more similar to "Ambrosia Supreme". In support of its contention complainant argues that the Office of Price Administration is prevented by the so-called Taft Amendment to the Emergency Price Control Act[3] from expanding "its requirements or standards beyond that set up by another Government Agency." It claims that standards for classes of beer were set up by a

---

[2] 8 F.R. 10902.

[3] Complainant relies upon part 4 of the Taft Amendment, Section 2(j) of the Act as amended: § 2(j) "Nothing in this Act shall be construed * * * (4) as authorizing any order of the Administrator fixing maximum prices for different kinds, classes, or

types of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."

regulation of the Federal Alcohol Administration providing that no "product containing less than one-half of 1 per centum of alcohol by volume shall bear the class designations 'beer,' 'lager beer,' 'lager,' 'ale,' 'porter,' 'stout,' or any other class or type designation commonly applied to malt beverages containing one-half of 1 per centum or more of alcohol by volume."[4] We do not agree with the position of complainant. The Federal Alcohol Administration regulation merely prescribes what shall be referred to as beer and what shall not. It does not promulgate, or require the use of, specifications or standards for different kinds, classes or types of beer. Therefore it obviously is not the type of a Government regulation referred to by the Taft Amendment.

■ Complainant makes the contention generally, as we understand it, that under the Regulation as it existed at the time the Administrator ruled on complainant's application, the Administrator was limited to comparison of the quality and ingredients of beers in determining their similarity. We find no reason for so restricting the meaning of "similar" as used in the Regulation. The Administrator has taken the position that in determining similarity his consideration must include not only brewing process and ingredients but also advertising history, trade usage, public acquaintance and price line in which the product being priced would normally have sold during the pertinent base period. This interpretation now has been incorporated into the Regulation by the language of Amendment No. 3.[5] But we think that even before the Amendment was issued, this was the natural and reasonable interpretation.[6] We must judge the meaning of the word "similar" in the light of its customary meaning and its context in the Regulation. Section 1420.59, prior to its amendment, stated that the selection of a similar malt beverage should "include" consideration of brewing process and ingredients. This language indicated that the determination of similarity was not to be limited to those considerations alone, and that the generally accepted definition of "similar" as "resembling in many respects" or "having a general likeness"[7] was the sense in which the word was used. We find nothing in the Regulation to modify this usual meaning given the word "similar".

■ On the basis of this interpretation, we cannot find that the Administrator was arbitrary or capricious in determining that "Ambrosia" was the more similar to "Ambrosia Supreme". "Ambrosia" was complainant's popular product. It represented 90% of complainant's sales. The new product was admittedly produced to cater to the same trade which had enjoyed "Ambrosia". The 90% of complainant's sales which had been of "Ambrosia" are now "Ambrosia Supreme". The strong resemblance in the names is persuasive of the similarity between the two products. The cost of the ingredients of "Ambrosia Supreme" was only 4¢ per barrel more than that of "Ambrosia," while "Nectar's" ingredients cost 10¢ per barrel more than those of "Ambrosia Supreme". The record indicates that "Nectar" had been and continued to be complainant's high priced, premium product. There is no showing of any significant similarity between the new beer and either of the old ones so far as ingredients are concerned. The only respect in which "Ambrosia Supreme" is shown to be clearly more similar to "Nectar" than to "Ambrosia" is in the percentage of alcohol by volume.

---

4 Section 24(c) of Regulations No. 7.

5 8 F.R. 16835. The Amendment, issued December 14, 1943, altered Section 1420.59 to read as follows: "A seller's selection of a similar domestic malt beverage * * * of his own or of his most closely competitive seller's manufacture shall include, but shall not be restricted to, considerations of similarity of (a) class and type ('beer,' 'lager beer,' 'ale,' 'porter,' 'stout,' or any other class or type designation commonly applied to malt beverages) as recognized under the provisions of Section 24 of Regulations No. 7, as amended, issued by the Federal Alcohol Administration, Treasury Department; (b) brewing process and types, grades, quantities and proportions of ingredients, without material variation; (c) advertising history, trade usage and public acquaintance; and (d) price line in which the domestic malt beverage being priced would have normally sold during the applicable base period."

6 Cf. Consolidated Water Power & Paper Co. v. Bowles, Em.App., 146 F.2d 492; Bowles v. Nu Way Laundry Co., 10 Cir., 1944, 144 F 2d 741.

7 Webster's New International Dictionary (2d Ed., 1939); Black's Law Dictionary (3rd Ed., 1933).

Although unnecessary to a decision of this case, we think it appropriate to point out that the Administrator's denial of complainant's application was in keeping with the purposes of the Regulation and those of the Emergency Price Control Act. The practice of replacing old beers which were subject to maximum prices considered unsatisfactory with new beers at higher prices was clearly inflationary. While we do not intimate or suggest any bad faith on the part of complainant, nevertheless the manufacture of "Ambrosia Supreme" as a substitute for "Ambrosia," if a higher ceiling price were permitted to be charged, would clearly interfere with the Administrator's purpose of maintaining effective price control.

The views which we have expressed dispose of a point made by complainant in an affidavit submitted to the Court after the complaint was filed. This affidavit was submitted directly to the Court with the consent of the Administrator, who, however, reserved the right to object to its materiality. The affidavit is a statement by a man employed for many years by a firm of consulting chemists as Director of the Chemical Laboratory and Technical Expert and Adviser to breweries and brewmasters on formulas for the making of beer and analysis of beer. He stated that an analysis was made, under his supervision and direction, of the three brands here involved and that the "analysis showed that 'Ambrosia Supreme' was a much more similar beer to 'Nectar' than it was to 'Ambrosia'." Counsel for complainant stated at the oral argument that this information had been before the Administrator during the protest proceeding and it appears from the record before us that the evidence was offered to the Administrator after the protest had been denied and he considered it of insufficient importance to warrant re opening of the protest proceeding. We have no doubt that the affidavit which apparently relates solely to chemical analysis, at best only one of the many factors to be considered in determining similarity, does not outweigh the evidence in the record showing that "Ambrosia Supreme" is more similar to complainant's "Ambrosia" than to its "Nectar".

Complainant takes the position that Amendment No. 2 is invalid as being an ex post facto law denounced by Section 9, Article I of the Constitution of the United States. Its position appears to be that Amendment No. 2, issued August 3, 1943, to take effect August 9, 1943, contained a retroactive clause providing that a manufacturer who previously (that is, between March 31, 1942, and August 9, 1943) had established a maximum price for his malt beverage newly produced must apply to the Administrator for authority to use the established price; while conceding the ex post facto Constitutional provision relates primarily to criminal cases, complainant suggests that "if the Price Administrator enters an order under Amendment No. 2, which is retroactive, and the person against whom the order is entered fails to obey it, he may be subject to criminal prosecution." Complainant's position is without foundation. The changes in the prices of malt beverages made possible by the Amendment were prospective only: in each instance the reductions could only become operative on or after the effective date of the Regulation. Therefore it is clear that the Administrator did not, within the meaning of the Constitutional provision, provide criminal consequences for acts committed before the issuance of the Amendment.

The complaint is dismissed.