**EBLING BREWING CO., Inc., v. PORTER, Price Administrator.**

Nos. 180 and 261.

United States Emergency Court of Appeals.

Heard at New York Feb. 20, 1946.

Decided Aug. 14, 1946.

James M Guiher, of Washington, D. C., (Sol H. Yellin, of New York City, on the brief), for complainant.

Benjamin Freidson, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Associate Gen. Counsel, and John O. Honnold, Jr., Chief, Court Review Price Branch, all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

These two complaints have been consolidated for hearing and disposition. No. 180 is based upon an order of the Price Administrator denying a protest against Amendment No. 2 to Maximum Price Regulation No. 259 and Order No. 2 thereunder. No. 261 is based upon an order denying a later protest against Revised Maximum Price Regulation No. 259, which incorporated Order No. 2 by reference. The consolidated proceeding relates to the maximum prices for complainant's beer product sold under the brand name "Ebling's Special Brew Premium Beer". This product had been introduced by complainant in June, 1943, in substitution for its historic product "Ebling's Extra Beer".[1]

Maximum prices for beer were originally established by the General Maximum Price Regulation issued April 28, 1942 (7 F. R. 3153). It was there provided that each seller's maximum price should be the highest price at which he sold or offered the commodity for delivery during March, 1942. The price of complainant's Ebling's Extra Beer was determined by this freeze formula.

On November 2, 1942, GMPR was superseded as to the products in question by Maximum Price Regulation No. 259—Domestic Malt Beverages (7 F.R. 8950). MPR 259 also employed the freeze technique, but permitted sellers of domestic malt beverages to take the period October 1–15, 1941, as well as March, 1942, as their base period, and to add to the base period prices certain amounts to cover increased costs and taxes. Section 66(h) of MPR 259 originally provided that, if a seller could not establish a maximum price by reference to his base period price for the same product, his maximum price must be established on the basis of his most closely competitive seller's maximum price for a similar domestic malt beverage.

Under date of June 16, 1943, complainant wrote the New York office of the OPA advising them that it was introducing a new product to be known as Ebling Premium Beer, manufactured according to a new formula and comparing in quality with the finest domestic beer sold in the area. The letter stated that complainant was establishing its prices for the new product "in accordance with the prices established by F. & M. Schaefer Brewing Co., Jacob Ruppert, P. Ballantine & Sons, and others selling comparable products." Complainant did not at this time make reference to its old product, Ebling's Extra Beer, nor state that it was discontinuing the manufacture of that product. In reply, dated June 17, 1943, the OPA Regional Office quoted § 66(h) of MPR 259 as applicable and stated that, "in following these provisions you are proceeding correctly with the pricing of your new Ebling Premium Beer".

On August 3, 1943, the Administrator issued Amendment No. 2 to MPR 259, effective August 9, 1943 (8 F.R. 10902). This amendment changed § 66(h) to read, in part, as follows:

"(h) If the seller's maximum price for a domestic malt beverage to be priced cannot be determined under any of the above paragraphs of this section, the seller's maximum price for a domestic malt beverage shall be:

"(1) For manufacturers. (i) The maximum price established by the manufacturer under the provisions of this regulation for the similar domestic malt beverage most nearly like it, for sales to purchasers of the same class: * * *

"(ii) If the manufacturer's maximum price cannot be determined under (i), he shall apply to the Office of Price Administration for authorization to determine his maximum price in accordance with the maximum price established under this regu-

---

[1] During 1942, and prior years, the old product, Ebling's Extra, had been distributed in an area embracing New York, New Jersey, Maine, New Hampshire, Connecticut, Massachusetts, North Carolina, South Carolina, Florida, Pennsylvania, Delaware, and Maryland. Due to wartime transportation restrictions, complainant's area of distribution has been gradually narrowed, but as of February, 1945, complainant's beer was still sold in New York, New Jersey, Connecticut, Massachusetts, and New Hampshire.

lation by his most closely competitive seller of the same class for the similar domestic malt beverage most nearly like it, for sales to purchasers of the same class: * * *

"(a) Form and contents of application. * * *

"(b) Approval of or objection to application. If within 30 days after receipt of the application by the Office of Price Administration, the manufacturer shall not receive notice of objection to the maximum price proposed in the application by letter from the Office of Price Administration, he shall be deemed authorized to establish such maximum price for sales of the item: Provided, That if within the 30-day period the Office of Price Administration shall by letter request supplemental information with respect to any matter set forth in the application, that period shall be figured from the date on which the requested supplemental information is received in writing by the Office of Price Administration. * * *

"(c) New products priced since March 31, 1942 and prior to August 9, 1943. A manufacturer who since March 31, 1942 and prior to August 9, 1943 has established a maximum price for a domestic malt beverage newly produced by him, according to the maximum price of a competitor's similar item, shall within 30 days after the latter date apply to the Office of Price Administration for authorization to use the established price, in the manner prescribed under (a) and subject to the method of approval or objection prescribed under (b): Provided, That with respect to a domestic malt beverage for which an application is required to be filed pursuant to this paragraph, the manufacturer may not sell or deliver such item after August 8, 1943 until a maximum price is authorized under this paragraph, except under an agreement with the purchaser to adjust the selling price to a figure not higher than the maximum price which is later authorized under this paragraph. * * *"

As thus amended, § 66 required that a manufacturer must establish maximum prices on a malt beverage introduced subsequent to the base period in accordance with his own "similar" malt beverage most nearly like it for which he had an established maximum price; he could price a new product by reference to the maximum prices of a competitor for a similar product only if he did not have an established maximum price for a "similar" malt beverage of his own manufacture. Also, manufacturers who, like complainant, had already, between March, 1942, and August 9, 1943, established maximum prices by reference to competitors' prices under the terms of § 66(h) in its original form, as well as manufacturers thereafter proposing to establish maximum prices for new products by reference to competitors' prices, were required to apply to the Price Administrator for approval of maximum prices consistent with this standard.

In conformity with the new requirements of § 66(h), complainant, on August 18, 1943, applied for authorization to maintain the prices theretofore established for its Special Premium Brew, that is, prices which had been based upon competitors' maximum prices for similar products. The application in general followed the form prescribed in § 66 (h) (1) (ii) (a). In giving information as to other domestic malt beverages manufactured and sold by it, complainant stated, without further explanation: "None." Under the heading, "Explanation of reasons applicant is unable to establish maximum price for new item according to maximum price of any of his own brands," complainant did not discuss its recently discontinued product, Ebling's Extra Beer, and referred to it only by stating that complainant was "the only brewery in the metropolitan area who, prior to the introduction of our Special Brew was selling malt products below the generally prevailing prices." Complainant further stated that it had established a rule that it would not sell beer to any retailer who increased the prices of its product to the consumer beyond the prices established by him prior to the introduction of the Special Premium Brew; and that the consumer will therefore not be required to pay any increase in price "by reason of the prices set forth for our Special Premium Brew."

On September 7, 1943, the OPA acknowledged receipt of complainant's application and requested additional information as follows:

"1. Prices to wholesalers and retailers for all other domestic malt beverages sold by your company during and since March 1942.

"2. Total raw material costs per 1 barrel of Ebling's Special Premium beer.

"3. Total raw material costs per 1 barrel of other domestic malt beverages manufactured by your company."

Complainant replied on October 2, 1943, furnishing the first two items of information requested, and, as to the third, merely stated that "We do not manufacture any other domestic malt beverage." Complainant also enclosed a profit and loss statement showing a loss of $191,555.35 for the period between December 1, 1942, and June 30, 1943, stating that "It is for this reason that we are seeking a price comparable with all other breweries in New York City." An analysis by Schwarz Laboratories, Inc., was submitted, making comparison between Ebling's Special Brew Premium Beer and beers of other leading breweries selling in the New York area. It was asserted that, on the basis of this analysis, complainant's new product compared favorably with other beers on the market with which complainant was seeking to establish a comparable price. However, complainant submitted no analysis or information upon which it would have been possible to make a comparison between its Premium Beer and its recently discontinued Ebling's Extra.

Complainant's aforesaid application was denied by the OPA in a letter dated October 19, 1943. It was explained that under Amendment No. 2 a manufacturer is authorized to establish maximum prices for a new malt beverage according to his most closely competitive seller's maximum price for a similar product "only when the particular manufacturer seeking a price has no similar malt beverage of his own." It was pointed out that in determining "similarity," "a seller must consider characteristics other than those pertaining to ingredients, quality, etc., and apply such additional tests as advertising history, trade usage, and public acquaintance." The letter stated that complainant would be required to establish maximum prices for its new product in accordance with the maximum prices of its base period product, Ebling's Extra Beer.[2]

The ruling contained in the letter of October 19, 1943, was, at complainant's request, embodied in a formal order, issued November 19, 1943, designated as Order No. 2 under MPR 259. In view of the fact that up to that time complainant had not even

---

[2] Section 59 of MPR 259 originally read as follows:

"Standards of quality. 'Quality' of a domestic malt beverage as used in § 1420.57(b) is determined by the grade and proportion of the ingredients used and by the brewing process employed. The selection of a similar malt beverage in § 1420.66(h) shall include consideration of 'similar quality' which is the quality obtained by reason of a similar brewing process and equivalent types, grades and proportions of ingredients, without substantial variation."

In interpreting § 59, the Administrator has taken the position that factors to be considered in determining similarity must include not only brewing process and ingredients but also advertising history, trade usage, public acquaintance, and price line in which the product being priced would normally have been sold during the base period. This interpretation was made explicit by Amendment No. 3 to MPR 259, issued December 14, 1943 (8 F.R. 16835), by which Amendment § 59 was modified to read as follows:

"Determination of similarity. A seller's selection of a similar domestic malt beverage, for purposes of § 1420.66(h), of his own or of his most closely competitive seller's manufacture shall include, but shall not be restricted to, considerations of similarity of (a) class and type ('beer,' 'lager beer,' 'ale,' 'porter,' 'stout,' or any other class or type designation commonly applied to malt beverages) as recognized under the provisions of section 24 of Regulations No. 7, as amended, issued by the Federal Alcohol Administration, Treasury Department; (b) brewing process and types, grades, quantities and proportions of ingredients, without material variation; (c) advertising history, trade usage and public ac-

attempted to establish that its Special Brew Premium Beer was dissimilar to its base period product, Order No. 2 properly denied complainant's application under the terms of § 66(h), as amended, for authorization to base its maximum prices for its new product upon its competitors' maximum prices.

On January 15, 1944, complainant filed its protest against Order No. 2 and Amendment No. 2 to MPR 259. In the alternative, the protest alleged (1) that Order No. 2 was erroneous under the terms of Amendment No. 2, and (2) that, if Order No. 2 was authorized by the terms of Amendment No. 2, that amendment was itself invalid on several asserted grounds. The relief requested was approval of its prices for its Special Brew Premium Beer as applied for in its application dated August 18, 1943; and modification of Amendment No. 2 so as to provide for the approval of maximum prices which had theretofore lawfully been established in accordance with the terms of §. 66(h) of the regulation prior to amendment.

The Administrator denied this protest by order issued October 6, 1944, with accompanying opinion. Thereafter complaint No. 180 was filed in this court.

We granted an application by complainant for leave to introduce additional evidence, pursuant to which the Administrator reopened the protest preceedings. Complainant then introduced various affidavits, photographs and displays relating to the advertising history of its new product and designed to show the extent of public recognition of it as a new and superior brew. On April 24, 1945, the Administrator issued a supplemental opinion in which he concluded, after full review of the additional evidence, that complainant had still failed to show that its new Premium Brew was dissimilar to its base period product. He therefore adhered to his earlier ruling denying the protest.

Meanwhile, on December 12, 1944, Revised Maximum Price Regulation No. 259 had been issued (9 F.R. 14537). The revised regulation incorporated by reference Order No. 2 issued under MPR 259; hence the maximum prices for complainant's Special Brew Premium Beer remained as theretofore.

On April 30, 1945, complainant filed its second protest, directed against provisions of RMPR 259. The protest renewed the objections which had been urged in the earlier protest, and in addition raised objections based upon the alleged discriminatory operation of certain provisions of the revised regulation. No new evidence was introduced, but the evidence in the earlier proceeding was incorporated by reference. The protest was heard by a Board of Review, which recommended denial. On August 20, 1945, the Administrator issued an order denying the protest, with opinion. In due time complainant filed its complaint No. 261 against the order denying its second protest.

In his opinion on the second protest (No. 261), the Administrator raised a question of administrative res judicata. He said: "Most of the basic issues raised in the instant proceeding were raised in the earlier protest proceeding and there determined. In the judgment of the Price Administrator the assertion of these contentions for the second time in this proceeding is improper." It may well be that where a protest raising certain objections to a regulation is denied, and the protestant fails to seek review in this court by a complaint filed within the time allowed by law, such protestant may may not be entitled thereafter to obtain administrative reconsideration of the same objections by the filing of a second protest and, upon denial of the same, to obtain judicial review in this court on the merits by the filing of a complaint under § 204(a), Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 924(a). If the sec-

---

quaintance; and (d) price line in which the domestic malt beverage being priced would have normally sold during the applicable base period."

As this court pointed out in Ambrosia Brewing Co. v. Bowles, Em.App., 1944,

147 F.2d 550, 552, the only effect of Amendment No. 3 was to incorporate explicitly into § 59 a natural and reasonable administrative interpretation of the phrase "similar domestic malt beverage" as used in § 66(h).

ond protest were denied, not on the merits but on the ground that the issues raised had already been determined in the earlier protest proceeding, this court might be justified in dismissing the complaint upon the ground that the second protest had been properly denied under the principles of res judicata. However, we need not rule upon this interesting point in the present case, because a complaint was duly filed in this court upon denial of the first protest, and all the objections raised in both protest proceedings are now properly before us on the merits. Furthermore, in his opinion in No. 261, the Administrator, though disclaiming any obligation to do so, in fact fully reconsidered the merits of the objections which had been raised in the earlier protest proceeding.

We consider first the challenge to the validity of Order No. 2. This order was a denial of an application which complainant had made pursuant to the provisions of § 66(h) of the regulation as amended by Amendment No. 2. The question is, then, whether, under a proper interpretation of the terms of amended § 66(h), and on a permissible view of the evidence, the Administrator was warranted in denying the application.

Complainant points to the fact that, on August 9, 1943, the effective date of Amendment No. 2 to MPR 259, it was selling no beer product other than the one to be priced —Ebling's Special Brew Premium Beer. Therefore, argues complainant, clause (i) of § 66(h) (1) of MPR 259, as amended by Amendment No. 2, was inapplicable to its new beer product, which had to be priced pursuant to application under clause (ii) (c) in accordance with the established maximum prices of complainant's closest competitor. Under this suggested interpretation, it would be immaterial that complainant's new product might have been in any respect, or indeed in all respects, similar to a base period product of complainant's which had been discontinued prior to August 9, 1943; regardless of that, complainant would be entitled to competitive pricing of its newly introduced brew. From this it would follow that, under amended § 66(h), a seller could obtain a higher maximum price for a new brand differing in

no material respect from his base period brew, by the device of discontinuing sale of the old product a week or two, or even a day, before introducing the new brand.

■■ We think it clear that such is not the proper interpretation of the regulation. Complainant inaccurately paraphrases the language and effect of amended § 66(h) by saying that the seller "was to price a new product competitively if he had no other similar product *at the time*." That is not what the regulation says. Clause (i) of § 66(h) (1) provides that a manufacturer of domestic malt beverages who introduces a new brand item subsequent to the base period shall take as his maximum price the "maximum price established by the manufacturer under the provisions of this regulation for the similar domestic malt beverage most nearly like it, for sales to purchasers of the same class." There is no proviso that the base period product upon which the manufacturer has established a maximum price under the provisions of the regulation must be currently offered for sale at the time the new brand is being introduced or priced. We agree with the Administrator that an established maximum price is not extinguished when the sale of the commodity in question is discontinued or suspended—such maximum price remains legally in effect and is applicable to any future sale of the commodity. If the seller should contemplate the expediency of resuming sale of the commodity, he would naturally take into account that it has an established maximum price "under the provisions of this regulation". When Ebling's Special Brew Premium Beer was introduced, there existed an established maximum price under the regulation for Ebling's Extra Beer; if the old brew was a domestic malt beverage "similar" to the new brand, the latter could be, and had to be, priced under clause (i) of § 66(h) (1), and no reference could be made to competitors' prices under clause (ii) thereof.

It also seems to us to be clear that, even though a manufacturer had, prior to the effective date of Amendment No. 2, properly priced a new brand by reference to competitors' maximum prices, the amended

§ 66(h) contemplates that such price for the new brand may have to be revised downward to conform to the established maximum price of a malt beverage sold by the manufacturer during the base period, unless the manufacturer, upon application to the OPA under clause (i) (c) of § 66 (h) (1), maintains the burden of showing that the new brand is not "similar" to the manufacturer's base period product according to the criteria of similarity already referred to above.[3] The overriding pricing rule, both for new products which had been priced between March, 1942, and August 9, 1943, by reference to competitors' prices, and for new products introduced after August 9, 1943, is found in clause (i) of § 66 (h) (1). In either case, it is only if the new product cannot be priced under clause (i) that resort may be had to competitors' prices under clause (ii).

■ Upon the factual issue of similarity or dissimilarity of complainant's new brew to its base period product, without rehearsing the evidence in great detail we state our conclusion that the Administrator was warranted in finding that the complainant had failed to sustain its burden of establishing dissimilarity.

The two malt beverages in question are of the same "class and type," namely, "beer." In the absence of a strong showing of differences between the two products under the other criteria of similarity as formulated in § 59, the Administrator is warranted in finding that they are "similar" domestic malt beverages within the meaning of clause (i) of amended § 66(h) (1). As the Administrator pointed out in his original opinion in No. 180, establishment of a maximum price solely by reference to brewing processes and alleged quality of ingredients would create insuperable difficulties, "especially at the present time when the consuming public, because of the shortage of malt beverages, does not discriminate in its choice of brew." Premium quality of beer and its acceptance by the public as such are based upon public taste and individual preference, factors not susceptible of precise measurement or effective administration. Members of the industry themselves are far from agreement as to what objective factors are determinative of quality. Hence, in processing applications filed under amended § 66(h), the Administrator "has adhered to the principle that a maximum price will not be approved which is higher than the manufacturer's maximum price for a malt beverage of the same class or type unless it is shown both that there has been substantial improvement in the ingredients and brewing process, and that this alleged improvement in quality has been reflected in public acceptance of the new brew as a premium product" prior to August 9, 1943, the effective date of Amendment No. 2.

In an effort to establish differences in ingredients and brewing processes, complainant relied chiefly upon an affidavit by Philip Steber, who has been its brewmaster since 1939 and for five years prior to that its assistant brewmaster. Mr. Steber fails to analyze the ingredients of the old and new products, nor does he disclose or offer to disclose the brewing formulae and processes used in the production of the two beers. Such formulae, he asserts, are "kept highly confidential by brewmasters." The affidavit does make the general claim that, in quantities and proportions of ingredients, manufacturing process, etc., the formula for the new brew was "distinctly different" from any theretofore employed by complainant and that the new product was "markedly superior to any theretofore produced" by complainant and "at least equal in quality and frequently superior to any now being produced by our competitors." In further extenuation of the failure to make more specific disclosures, Mr. Steber states that the popularity of a beer does not depend upon a description of the ingredients used; "it is only the end result which counts in the mind of the consumer." Factors of quality such as "body," "color," "flavor," and "balance," are "not susceptible of precise measurement". The only concrete information supplied in the affidavit is a table of cost figures of ingredients per barrel for each month of 1943 and the first five months of 1944. These figures disclose only an increase of a few cents in the

---

3 See footnote 2, supra.

cost of ingredients per barrel for the month of July, 1943, the first full month after the introduction of the new brew, over the cost in previous months' for the old product. The increase amounted to about 7/10¢ per case of 24 12-oz. bottles.

In his Supplemental Opinion in No. 180, the Administrator adverted to the lack in the evidence of specific information as to the extent of any changes in ingredients and brewing processes, information within complainant's control. However, when the same issue of similarity was raised in the protest proceeding in No. 261, complainant offered no further evidence on this point.

■ Complainant also failed to establish, as of August 9, 1943, a public recognition and acceptance of the new brew as a distinctly different product superior to the old and belonging in the price line of "premium" beers. The difficulty of establishing this is obvious, since the new beer had only been introduced two or three weeks before. Evidence of complainant's advertising of the new product related almost without exception to dates subsequent to August 9, 1943, which is true also of the reception accorded to the new product in the trade, and of consumer reaction. Even apart from the point as to date, the evidence as a whole might properly be regarded by the Administrator as unconvincing. Complainant did embark upon a quite extensive advertising campaign after the introduction of its new brew. But, as the Administrator pointed out, the evidence of advertising history indicates a playing up of the name "Ebling's" as representing an old-established product, with a repetition of the old slogans such as "That grand old beer," and "Aged in natural rock caves," rather than emphasizing the introduction of a new, distinctly different product markedly superior to that grand old beer Ebling's Extra. Many of the statements from dealers praised Ebling's product without differentiation between the old and the new; others speak of having dealt in the premium brew for various periods of time which in fact antedated the introduction of the new product. The evidence is extensively analyzed in the Administrator's Supplemental Opinion. His conclusion is

that he cannot find from the evidence that the so-called new beer had an advertising history, trade usage, and public acceptance as a new product which would distinguish it from the beer for which complainant had an established price. This finding is not without rational support in the evidence, and hence must be accepted by us.

The challenge to the validity of Order No. 2 is not sustained. There remain for consideration various objections to provisions of the regulation itself.

■ In his opinions in the two protest proceedings, the Administrator has explained the need for Amendment No. 2: Under normal competitive conditions, a few well-advertised beers had achieved general public acceptance as "premium" products, and thus had commanded somewhat higher prices than the general run of beers. Brewers who, like complainant, were caught with low freeze-date prices for their base period products were naturally under strong incentive to get rid of what they regarded as unsatisfactory maximum prices. Due to the lack of administratively workable objective standards of quality in the particular industry, it was possible for such brewers to introduce a new brand in substitution for the old, and, after inconsequential changes in ingredients or brewing processes, to assert that the new product was now comparable to "premium" brands customarily sold for higher prices. Due to wartime shortages and increased consumer demand, such new products were able to command premium prices. Under § 66(h) of MPR 259 in its original form, the maximum price of a new brand was not determined by reference to the particular manufacturer's base period product, but was fixed on the basis of the most closely competitive seller's maximum price for a similar malt beverage. There is included in the transcript a copy of a bulletin by an organization of small brewers circulated among its membership of some 270 brewers throughout the United States calling attention to the inflationary possibilities under MPR 259 of getting rid of "low priced Beers" and introducing "Premium" products to be priced according to maximum prices of like premium products of their closest

competitor. In Ambrosia Brewing Co. v. Bowles, Em.App., 147 F.2d 550, 551, this court made reference to the inflationary practice which had developed under MPR 259 "of introducing new brands of beer on the market and pricing them in relation to high priced beers of competitors." Amendment No. 2 to MPR 259 was the Administrator's countermove to this inflationary threat, and under the circumstances we cannot say that the terms of Amendment No. 2 were arbitrary or capricious or inappropriate to effectuate the policies of the Act.

Complainant makes something of the point that, in the formal Statement of Considerations accompanying the issuance of Amendment No. 2, the Administrator does not spell out the foregoing reasons for the amendment, but rather emphasizes that the amendment facilitates the pricing of new products by both manufacturers and other sellers in providing the more accessible device of utilizing maximum prices established under the regulation for similar items sold by them, pointing out that, under the provisions of Amendment No. 2, "the occasion should be rare where either a manufacturer or other seller of domestic malt beverages who has established products of his own, will find it necessary to resort to the maximum price of his most closely competitive seller." It is true, § 2(a) of the Act provides that every price regulation or order "shall be accompanied by a statement of considerations involved in the issuance of such regulation or order." But when the validity of a regulation is brought into question, there is nothing in the Act to preclude the Administrator from advancing on their merits additional considerations designed to show that the challenged provisions are reasonably adapted to effectuating the statutory purposes.

It is objected that Amendment No. 2 in practical application amounts to a price line limitation wherever a manufacturer introducing a new brand happened to have sold during the base period a malt beverage of the same "class and type". If such a brewer brought out a new beer after August 9, 1943, the effective date of Amendment No. 2, he could not, by application under revised § 66(h), obtain permission to establish a maximum price comparable to the maximum price of a premium product of his closest competitor because he could not, under the criteria of similarity laid down by the Administrator, sustain the burden of showing that the new product was dissimilar to his old. The new product could not be sold until the OPA had acted on the brewer's application for authorization to price it competitively; hence the applicant would be unable to produce evidence of advertising history, trade usage, and public acquaintance tending to show consumer acceptance of the new product as a distinctly different brew superior in quality to the base period product and one which normally would have sold, during the applicable base period, in the price line of premium beers. Therefore, in pricing such new product, the brewer could not get out from under clause (i) of revised § 66(h) (1), whereby his maximum prices were fixed by reference to the established maximum prices of his base period malt beverage. So, too, a brewer who had already introduced a new brand between April, 1942, and August 9, 1943, and who had lawfully priced the new brand competitively under § 66(h) in its original form, could not, except in rare instances, establish the new product as dissimilar to his base period product of the same class and type, and hence would have to accept revised maximum prices for the new brand conforming to the maximum prices established under the regulation for his base period product. This difficulty of proof was especially apparent in cases like complainant's where the new brand had been introduced only a brief period before August 9, 1943.[4]

---

[4] In his original opinion in No. 180, the Administrator refers to 56 applications under amended § 66(h) for approval of maximum prices of new items of malt beverages of the same type and class as a beverage manufactured by the seller during October 1–15, 1941, or March, 1942. In only one case was it found that a new brand introduced after March, 1942, had been, prior to August 9, 1943, established by advertising history and trade acceptance as a premium product dissimilar to the base period product.

■ The Administrator has frankly conceded that Amendment No. 2 in practical effect operated as a price line limitation. In his original opinion in No. 180, he stated that "from the standpoint of price control in the domestic malt beverage industry, limitation of price lines represents the only feasible method of checking the strong inflationary tendencies which have shown themselves in that industry." This court held, in Montgomery Ward & Co., Inc. v. Bowles, Em.App., 1945, 147 F.2d 858, that under his broad discretionary authority the Administrator is empowered by the Act to impose highest price line limitations. Section 2(k), added to the Emergency Price Control Act by the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix, § 902 (k), forbade the imposition of highest price line limitations at the retail level but did not invalidate such limitations at producer or wholesale levels. It might have been better if Amendment No. 2 had been more candidly, or more explicitly, labelled as a price line limitation. But if the substantive effects achieved by the provisions of the regulation are within the power of the Administrator to prescribe, the regulation cannot be held invalid for lack of the familiar label describing that type of regulation.

It was certainly within the authority of the Administrator to subject new brands introduced after the effective date of Amendment No. 2 to what was in effect a highest price line limitation. Complainant had introduced its new brew shortly before that date and had established a maximum price thereon upon a competitive basis in a price line higher than that of its base period product—as was permitted by the regulation at that time. But sellers do not have a vested right in an established maximum price (see §§ 2(c) and 201(d) of the Act, 50 U.S.C.A.Appendix, §§ 902(c), 921(d); and it may not be unreasonable in particular cases for the Administrator to roll back maximum prices so as to undo inflationary movements which experience has disclosed were not sufficiently guarded against in the original provisions of a price regulation. We are unable to say that it was arbitrary or capricious for the Administrator to make the provisions of Amendment No. 2 applicable to brands which had

been introduced between April, 1942, and August 9, 1943. As the Administrator points out, this was done in order "to preclude discrimination in favor of those who had participated in the inflationary production of premium beers prior to the effective date of Amendment No. 2."

■ Nor was complainant unlawfully discriminated against because, under the terms of Amendment No. 2, it was possible for a few brewers who had introduced new beers between April, 1942, and August 9, 1943, to escape from the restrictions of their base period price lines. In these rare cases, as we have pointed out above, an exception was made to the application of Amendment No. 2 as a rigid price line limitation. But it was not unreasonable to make this exception in favor of any brewer who, prior to the effective date of Amendment No. 2, had won public recognition and acceptance of his new brew as a distinctly different product superior to the old and belonging in a price line of "premium" beers. Complainant would have been accorded similar treatment had it been able to make a similar showing.

■ Complainant is particularly insistent that the provisions of Amendment No. 2 discriminated against it and others who were selling only one beer product during the base period, in favor of other brewers who, during the base period, were selling two or more brands of beer in different price lines. Under the provisions of the regulation, a seller who had a base period product commanding a premium price could concentrate on the production and sale of this higher priced brand and curtail or discontinue the sale of its cheaper product; whereas complainant, whose single base period beer, or whose subsequently introduced brand, might have been intrinsically as good as a competitor's "premium" product, is held down to the lower maximum price established for its historic Ebling's Extra Beer. The position in which complainant finds itself results from the fact that, in the base period prior to price control, complainant had priced its beer lower than the generally prevailing prices. The base period competitive relationship existing between complainant's beer and so-

called "premium" beers of other brewers is preserved in the regulation—a freeze type of price control fully authorized by the Act. Pfeiffer Brewing Co. v. Bowles, Em.App., 1945, 146 F.2d 1006, 1008, certiorari denied 1945, 324 U.S. 865, 65 S.Ct. 914, 89 L.Ed. 1421.

It is true that a movement in the industry in the direction of abandoning production of lower base period price lines and increasing production of higher priced products, if sufficiently widespread, would have inflationary tendencies that would warrant some special countermeasures by the Administrator. In certain industries the Administrator has sought to combat such diversion of output from cheaper to more expensive products by a special pricing technique known as the "maximum average price." Complainant's contention comes down to this: That a freeze type of regulation is invalid as against a manufacturer caught with a low base period price, unless the regulation contains something akin to a "maximum average price" limitation under which his multiple-brand competitors would be permitted to produce at a particular price line only that percentage of their sales which was equal to the percentage of that price line produced during the base period. We find nothing in the Act which would point to such a conclusion. In fact, in the recently enacted Price Control Extension Act of 1946, § 2 of the Act has been amended by the addition of a paragraph (p), 50 U.S.C.A.Appendix, § 902(p), providing that, after July 1, 1946, "no maximum price regulation or order shall be issued or continued in effect requiring any seller to limit his sales by any weighted average price limitation based on his previous sales." But the basic authority of the Administrator to control prices on the freeze pattern has not been withdrawn.

In No. 261, complainant presses the additional objection that it is arbitrarily discriminated against in Revised Maximum Price Regulation No. 259, issued December 12, 1944, in that, by § 2.6 thereof, new manufacturers who did not go into business until after the base period may charge prices for their product, of whatever quality or consumer appeal, in accordance with the dollars-and-cents prices set forth in Table III of the regulation, which prices are said to be in all respects higher than those permitted to complainant by Order No. 2.[5]

But § 2.6 of RMPR 259 provides that the maximum prices of a new brewer entering the field since the base period shall be the *lower* of (1) the maximum prices of his most closely competitive brewer—and it is pure assumption that this might not be the complainant—or (2) the dollars-and-cents prices prescribed in Table III. These Table III prices were computed from base period prices of the great majority of brewers and are industry-wide averages for the particular type, container, and case size listed. Table III operates as an overriding limit on prices which new sellers might take from a competitor. Its purpose, as explained by the Administrator in his Statement of Considerations, was to prevent the use of exceptional situations to establish unwarranted prices for new domestic malt beverages, and to avoid disruption of the level of prices in the industry by the appearance of new sellers. Even though, under RMPR 259, a new brewer might possibly obtain maximum prices higher in some instances than those applicable to complainant's product, the classification is supportable on a rational basis. Cf. Pfeiffer Brewing Co. v. Bowles, supra. We agree with the statement in respondent's brief that, "in relation to existing prices as a whole, new brewers are not in a favored position; on the contrary, there is no opportunity for such new brewers even if they seek to compete with a seller having a higher maximum price to acquire prices above the industry average prices— an opportunity which was open to Complainant during and prior to the base periods."

It has not been shown that the maximum prices established by the regulation are generally unfair and inequitable as applied

---

[5] The record seems to indicate that, in certain instances, complainant's established maximum prices are in fact slightly in excess of the maximum prices set forth in Table III; but for the most part the Table III prices are somewhat in excess of complainant's maximum prices.

to the industry as a whole. A freeze type of regulation is not invalid merely because a particular individual, caught with a low base period price, is unable to operate profitably under it. Section 2.10 of RMPR 259 makes provision for application to the Office of Price Administration for individual adjustment in cases where the applicant's maximum prices are below the average level of brewers' maximum prices for similar domestic malt beverages in the same trading area, and where other somewhat exacting conditions are met. The Administrator has expressed his judgment that this adjustment provision "provides as much relief from the effect of unusually low prices in the base period as is feasible within the framework of the 'freeze' provisions of the Regulation". Complainant has not applied for relief under this provision; and, indeed, in its brief expresses doubt that it would be entitled to relief thereunder.

A judgment will be entered dismissing the complaints.