**ALLIED OIL CORPORATION v. TURNEY,**
Director, Division of Liquidation,
Department of Commerce.
No. 471.

United States Emergency Court of Appeals.
Heard at Chicago Sept. 15, 1948.
Decided Oct. 14, 1948.

David F. Dockman, of Chicago, Ill., (Thomas J. Downs, of Chicago, Ill., on the brief), for complainant.

Israel Convisser, of Washington, D. C. (Tom C. Clark, Atty. Gen., Alexander M. Campbell, Asst. Atty. Gen., and Floyd L. Cook and Charles G. Mulligan, all of

Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

LINDLEY, Judge.

Complainant operates an oil refinery at St. Elmo, Illinois, in an area known as "Central Illinois." In 1943, for the first time, it began to refine diesel engine fuel and market it on a guaranteed specification basis. On March 20, 1944, it applied to the Office of Price Administration for maximum sales prices for three such fuels having diesel index ratings respectively of 58 and above, 53 to 57 and 52 and below, of, respectively, 5.75¢, 5.625¢, 5.5¢ per gallon f. o. b. its refinery, for tank car shipment into Petroleum Administration for War, District One, consisting generally of the East Coast states. The request was made pursuant to Section 8.3 of MPR 88, issued February 14, 1944 (9 F.R. 3718), the applicability of which is not in dispute. It reads in part as follows:

"Sec. 8.3 For All Other Products Covered By This Regulation. (a) If under any preceding section of this regulation a seller is unable to determine the maximum price at a given shipping point for any product covered by this regulation then the seller may nevertheless make a sale of such product at the said point or may notify the Office of Price Administration in writing that he has set a tentative maximum price for the product at the said shipping or delivery point. In giving notice of the setting of such tentative maximum price or within 15 days of the making of the said sale, the seller shall file with the Petroleum Branch of the Office of Price Administration, Washington, D. C., a written request for the approval of either the tentative or sale price * * *.

"(b) If a seller shall fail to report a sale as required by paragraph (a) above the Office of Price Administration may at any time upon written notice to the seller establish his maximum price for the particular product at the particular point effective retroactively to a date 15 days after the making of the said sale."

By letter order dated April 12, 1944, the Office of Price Administration disapproved the prices proposed by complainant and established instead the following maximums:

| | |
|---|---|
| 58 Diesel Index and above | 5.00¢ per gallon |
| 53–57 Diesel Index | 4.875¢ per gallon |
| 52 Diesel Index and below | 4.75¢ per gallon |

Subsequently, it having come to the attention of the Administrator that complainant had not applied for maximum prices within 15 days after its first sale of the product, he, in accord with section 8.3(b), by Order No. L-551, issued April 7, 1947, amended the order of April 12, 1944, so that the maximum prices established therein became effective 15 days after complainant's first sale.

Complainant filed a protest of both orders and, following denial, its complaint in this court. Inasmuch as an action to recover damages for alleged over-ceiling sales prices during the period July 19, 1943 to May 24, 1944 is pending against complainant, we have jurisdiction. Standard Kosher Poultry, Inc. v. Clark, Em.App., 163 F.2d 430; Talbot v. Woods, Em.App., 164 F.2d 493.

Complainant contends that the maximum prices established by the Administrator for its diesel fuels were invalid because they (1) were not "in line" with the base period prices in the Central Illinois area for similar fuels; (2) did not reflect then existing customary price differentials for different grades of petroleum products; (3) destroyed the competitive relationship of complainant with refiners in other areas; and (4) were discriminatory, in that Amendment 27 to MPR 88 provided a higher refinery realization or net back on delivered at destination sales in the Midwest Area than on f. o. b. sales to PAW District 1.

Complainant did not refine or sell diesel fuel during the base period,—the 60 days preceding October 15, 1941. Therefore, in determining its maximum prices on diesel fuel, the Administrator compared complainant's suggested maximum prices with the following prices at which three other

Central Illinois refiners sold such fuel during the base period:

| | Diesel Fuel | Diesel Index Rat. | Cetane Rat. |
|---|---|---|---|
| Pana Refining Co. | | | |
| (Pana, Ill.) | 4.88¢ | 58.6 | 53 |
| Shell Oil Co. | 4.5¢ | | |
| (Roxana, Ill.) | 4.7¢ | Minimum 45 | |
| Standard Oil Co. of Ind. | 4.1¢ | | |
| (Wood River, Ill.) | 4.6¢ | | 55 |

Pana's fuel was of diesel index rating comparable to complainant's highest rating; yet Pana sold its fuel for less than the maximum price fixed for complainant. While Standard did not mention its index rating, it did specify a cetane rating higher than Pana's. Therefore the Administrator felt it reasonable to assume that Standard's index rating was at least as high as Pana's if not higher.[1] Yet Standard sold its equivalent or better fuel for less than the maximum prices fixed for complainant.

■ But complainant insists that these comparisons, while appropriate on their face, were misleading in that the products compared were not the same, inasmuch as complainant's fuels were "guaranteed specification" fuels, while the other three refiners did not guarantee the specifications; that guaranteed specification fuels are commonly sold at a higher price than those not guaranteed; and, hence, that some differential in price should have been allowed it on that account.

It may well be true that, prior to the time price control was invoked, guaranteed specification fuels commanded higher prices than fuels on which there were no guarantees and equally true that the other three Central Illinois refiners did not, during the base period, guarantee their diesel index rating. But since the fuel sold by the other refiners during the base period was of a specified quality, their prices for future sales of that grade were, by virtue of the regulation, frozen at the price established therefor during the base period.[2] In other words, if Pana sold diesel fuel during the base period, with a diesel index rating of 58.6 at 4.88¢ per gallon, the regulation required it, in continuing to sell fuel of the same quality, to sell at the same price. Ebling Brewing Co. Inc. v. Porter, Em.App., 156 F.2d 1012, certiorari denied 329 U.S. 784, 67 S.Ct. 297, 91 L.Ed. 672. Under these circumstances, we can find no justification for a conclusion that the Administrator acted arbitrarily or capriciously in comparing complainant's diesel fuel with that of other Central Illinois refiners in determining a proper "in line" maximum price.

■ Complainant contends that it is the established practice of the oil industry to establish prices of petroleum products according to their respective economic values, and that, in that practice, high grade diesel fuel ranks ahead of fuel oils. Thus, complainant shows that in certain areas a differential of ½ to ⅝¢ per gallon generally existed between the prices of diesel fuel of the highest grade and No. 2 fuel oil. Complainant then observes that by Amendment 134 to RPS 88, which fixed complainant's maximum prices for sales of gasoline, fuel oils and heating fuels, the Administrator placed a maximum price of 5.00¢ per gallon on No. 2 fuel oil, the same price he fixed for complainant's highest grade diesel fuel. From this, it argues that the Administrator arbitrarily ignored an established customary price differential between the two fuels. But it is apparent from the many amendments to the price regulation covering the oil industry that industry pricing practices vary from area to area and even within the same area. Thus, while a price differential between high grade diesel fuel and No. 2

---

[1] Diesel Index and cetane ratings are the results of different but substantially equivalent tests for determining diesel fuel quality.

[2] MPR 88, Section 1.12 (b) Evasion.

The price limitations set forth in this regulation shall not be evaded * * * by a change in the quality of a product or otherwise.

fuel oil may have existed in some areas, the evidence reflects none such in Central Illinois. Pana sold its diesel fuel and No. 2 fuel oil at the same price—4.88¢ per gallon; Shell, its diesel fuel for 4.5¢ and 4.7¢ per gallon and its No. 2 fuel oil for 4.6¢ and 4.9¢ per gallon, and Standard, its diesel fuel for 4.1¢ and 4.6¢ per gallon and its No. 2 fuel oil for 4.6¢ per gallon. This is undisputed evidence that in Central Illinois, during the base period, no such price differential existed between diesel fuel and No. 2 fuel oil.

But, says complainant, in Amendments 26 and 27 to MPR 88, issued in April and June, 1945, the Administrator recognized the existence of such a differential during the base period. These amendments set up formula dollar and cents, delivered at destination prices, for sales of No. 2 fuel oil and diesel fuel, by diesel index ratings, within the eleven midwestern states, including Illinois, at the following levels: No. 2 fuel oil—3.625¢ per gallon, plus freight from Tulsa, Okla. Diesel Fuel, index 56 and above—4.125¢ per gallon, plus Tulsa freight. Diesel Fuel, index 45-55—4.00¢ per gallon, plus Tulsa freight. Diesel Fuel, index 44 and below—3.625¢ per gallon, plus Tulsa freight. This schedule apparently recognized an existing general differential between No. 2 fuel oil and high grade diesel fuel of ½¢ per gallon. In his Statement of Considerations to Amendment 27, the Administrator said: "The general level of maximum prices will remain unchanged by this amendment." Complainant argues that if this statement was true, then the pre-price control price levels throughout the entire area must have reflected the differential between No. 2 fuel oil and high grade diesel fuel and that the failure to apply to complainant the same differential resulted in an "out-of-line" price for its diesel fuel.

To this contention, respondent replies that Amendments 26 and 27 were applicable generally to an area of eleven states and purported to reflect price levels only generally and customarily applicable throughout this wide area, whereas the prices specifically set up for complainant purported only to reflect the actual prices in its immediate area, covering only a part of one state. Despite these amendments, the companies operating in Central Illinois were still bound by their actual prices existing during the base period. To have established for complainant the prices for the general area under the amendments would have allowed it prices in excess of the actual prices abiding in Central Illinois during the base period and clearly out of line therewith. We agree that one price may be fixed for complainant for its type of operation in its specific area even though the Administrator applies a different pricing technique to general operation within an eleven state Midwest area. In other words, local prices being known, it was entirely reasonable for the Administrator to freeze those local prices irrespective of the situation in other specific areas or in an eleven state wide area. Fleet-Wing Corporation v. Clark, Em.App., 166 F.2d 145, at page 149; Saunders Petroleum Co. v. Bowles, Em. App., 152 F.2d 112.

To support its contention that the maximum prices fixed for its diesel fuels do not reflect the relative competitive position of complainant in its relation to refiners of diesel fuel in other areas, complainant turns again to Amendment 134 to RPS 88, and submits the following table comparing prices established for it by Amendment 134 for gasoline, light fuel oils and heating fuels, with prices established for those same products in other areas:

| Product | Central Illinois Area Allied's Maximum Price | Ark., Tex., La. Maximum Price |
|---|---|---|
| 72–74 Oct. Gasoline | 7.25¢ | 5.75¢ |
| 41–43 Gra. W. W. Kerosene | 5.75¢ | 4.125¢ |
| Range or Stove Oil | 5.375¢ | 3.875¢ |
| No. 1 prime white distillate | 5.25¢ | 3.875¢ |
| No. 1 straw fuel oil | 5.125¢ | 3.75¢ |
| No. 2 fuel oil | 5.00¢ | 3.625¢ |

Then complainant compares the prices established for its diesel fuel with the prices fixed for such fuel in the other areas:

| | | |
|---|---|---|
| Diesel Fuel, Diesel index 58 and above.... | 5.00¢ | 4.25¢ |
| Diesel Fuel, Diesel index 53–57 ......... | 4.875¢ | 4.125¢ |
| Diesel Fuel, Diesel index 52 and below.... | 4.75¢ | 4.00¢ |

An examination of prices in the first part of the table discloses a differential between areas of 1.375¢ to 1.50¢ per gallon, while the prices in the latter part of the table reflect a differential of only .75¢ per gallon. From this, complainant suggests that, since the differential between the maximum prices established in Central Illinois and those in the compared areas is greater for gasoline and other fuels than it is for diesel fuels, the Administrator has failed to maintain customary competitive relationships, and that such failure is contrary to the administrative intent expressed in Amendment 134. We think that such a conclusion does not necessarily follow. Amendment 134 and the findings accompanying it were limited to products other than diesel fuels, and so cannot be considered as evidence of an administrative finding of the existence of an inter-area relationship between the different area prices of diesel fuels. In short, the validity of maximum prices fixed for diesel fuels does not depend upon any inter-area price relationship that may have existed as to gasoline and light fuel oils.

Complainant attempts to show that the prices fixed for it on f. o. b. sales for delivery into PAW District 1 were discriminatory because they enabled it to realize a lesser profit, or "net back" at the refinery than it would on deliveries within the Central Midwest area under Amendment 27. This argument is fallacious, however, because on deliveries in the Central Midwest area the "net back" would be less than on sales to PAW District 1 if the fuel was delivered at points where the actual freight charges amounted to more than the Tulsa freight.

We conclude that the Administrator properly established complainant's prices "in line" with the prices prevailing in the Central Illinois area during the base period; that, under the evidence, complainant's diesel fuels were comparable to the diesel fuels sold by other Central Illinois refiners during the base period; that complainant has not shown that a price differential existed between diesel fuel and No. 2 fuel oil in the Central Illinois area during the base period; and that the orders attacked were not invalid because of any pricing patterns set up in Amendment 134 to RPS 88 or Amendment 27 to MPR 88.

Judgment will enter dismissing the complaint.